James Clayton **FENOGLIO**, Appellant,

v.

The **STATE** of Texas, State.

Nos. 2–07–001–CR, 2–07–002–CR, 2–07–003–CR.

Court of Appeals of Texas, Fort Worth.

Feb. 21, 2008.

Rehearing Overruled March 13, 2008.

William A. Bratton, III, Dallas, David L. Richards, Fort Worth, for Appellant.

Jack A. McGaughey, Dist. Atty., Montague, for Appellee.

PANEL B: LIVINGSTON, WALKER, and McCOY, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

Appellant James Clayton Fenoglio appeals his convictions for possession of methamphetamine of at least four but less than two hundred grams, possession of four hundred or more grams of methamphetamine, and possession or transportation of anhydrous ammonia with the intent to manufacture methamphetamine. In four points, he challenges the trial court's denial of his motion to suppress, denial of his motion for mistrial, denial of his motion for new trial, and assessment of two sentences for what he contends is the same offense (possession of methamphetamine in two different weight categories). We affirm in part and reverse and render in part.

## I. Background Facts

On August 17, 2004, Officer John Spragins and his partner Officer Bobby Dilbeck flew over appellant's Montague County property in a helicopter looking for marijuana plants.[1] Although they were looking for marijuana over the entire county, they had received information that appellant might be growing marijuana, so they made sure to fly over his property that day.[2]

As the officers were flying over appellant's property, they saw five or six three-to-four feet tall marijuana plants growing in large, plastic containers. The plants were next to a row of hay bales at the end of a dirt road or trail[3] that led from the plants to the back part of the only house on the property. A large container of water and a scoop were next to the plants, which appeared to be in good condition.

The helicopter landed, and Officer Dilbeck radioed an already-assembled ground crew with its location. While he was waiting for the ground crew to arrive, Officer Dilbeck typed an affidavit for a search warrant on his laptop. The ground crew entered the property to secure it while Officers Dilbeck and Spragins drove in a car to Bowie to obtain a search warrant based on Officer Dilbeck's affidavit. Officer Dilbeck told the ground crew not to search the property until he and Officer Spragins had secured a warrant.

After the officers obtained a warrant, they returned to the property; no search had yet begun. At the entrance gate to the property, Officers Dilbeck and Spragins encountered appellant driving his truck. They stopped him and served the warrant. The officers asked appellant if he had drugs in the truck, and he said he did not know, but that there may be. Officer Dilbeck opened the door and looked in the truck; inside in plain view he saw a small pouch and a Tootsie Roll container

---

**1.** Officers Spragins and Dilbeck were both Wichita Falls police officers assigned to the North Texas Regional Drug Enforcement Task Force.

**2.** Officer Dilbeck had verified that the property was appellant's beforehand by looking at deed records and then driving by the house so that he could recognize it from the air.

**3.** Officer Dilbeck described it as a "beaten path."

on the seat. Inside the Tootsie Roll container, Officer Dilbeck found marijuana. He also found a glass pipe in a case that had burned residue consistent with marijuana or methamphetamine, an Altoids container that contained baggies with methamphetamine inside, and a handwritten list, which appeared to be a to-do list with items on it, such as "weigh smoke" and "Miracle Gro," all within the truck.

The officers arrested appellant, and they all went to the house. Appellant voluntarily unlocked the door to the house and gave officers the key. Appellant told the officers he would show them the other drugs in the house. He then showed them an envelope with marijuana in it and told them that it was all he had. The officers found several empty baggies in the kitchen that Officer Dilbeck thought could be used to package marijuana.

The officers also found a safe in the master bedroom. Appellant initially denied having the combination to the safe, but he eventually gave them the combination. Three bags of methamphetamine and a book entitled, *Marijuana Grower's Guide*, were inside the safe. The officers also found a tank with anhydrous ammonia and a large quantity of methamphetamine in a cooler on the back porch.

The State charged appellant with possession of methamphetamine of at least four but less than two hundred grams, possession of four hundred or more grams of methamphetamine, and possession or transportation of anhydrous ammonia with the intent to manufacture methamphetamine. A jury convicted appellant of all three offenses. In accordance with the jury's recommendation, the trial court sentenced appellant to ten years' confinement, probated for ten years, plus a $10,000 fine, on the first and third offenses, and to

twenty years' confinement, plus a $10,000 fine, on the second offense. Appellant appeals all three convictions.

## II. Motion to Suppress

In his first issue, appellant contends that the trial court erred by denying his motion to suppress. According to appellant, Officer Dilbeck deliberately or recklessly included false material allegations of fact in the affidavit supporting the search warrant in that (1) the allegation in the warrant that the officers landed the helicopter near the plants for "confirmation" "prevents any 'plain view' allegation from being substantiated in that the requirement of confirmation prevents them from being 'immediately apparent,'" and (2) the allegation that the plants were locate "near" the residence was false because the evidence showed that they were located two hundred to two hundred fifty yards from the house and that the plants could not be seen from the house. Appellant contends that when the warrant is considered without these allegations, the remainder is insufficient and, therefore, all evidence of methamphetamine, which the officers discovered pursuant to serving the warrant, should be suppressed.[4]

## A. Standard of Review and Applicable Law

An affidavit supporting a search warrant begins with a presumption of validity. *Cates v. State*, 120 S.W.3d 352, 355 (Tex.Crim.App.2003). In *Franks v. Delaware*, the United States Supreme Court held that when a "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affi-

---

**4.** Included within appellant's complaint is the contention that all items found in his truck should have been suppressed because "[n]o contraband was immediately apparent upon looking before the closed containers were opened and contraband was found."

davit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). To obtain a *Franks* hearing, a defendant has the burden of making a preliminary showing of deliberate falsehoods in the affidavit supporting the warrant. *Id.; Cates,* 120 S.W.3d at 355.

■ We review a trial court's decision on a *Franks* suppression issue under the same standard that we review a probable cause deficiency, a mixed standard of review: "We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor while we review de novo application-of-law-to-fact questions that do not turn upon credibility and demeanor." *Johnson v. State,* 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002); *Davis v. State,* 144 S.W.3d 192, 201 (Tex.App.-Fort Worth 2004, pet. ref'd). However, in a *Franks* hearing the trial court may consider not only the probable cause affidavit but also the evidence offered by the party moving to suppress because this attack on the sufficiency of the affidavit arises from claims that it contains false statements. *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676; *Cates,* 120 S.W.3d at 355 n. 3; *Davis,* 144 S.W.3d at 201.

■ Under *Franks,* a search warrant affidavit must be voided, and any evidence obtained pursuant to the search warrant excluded, if a defendant can establish by a preponderance of the evidence at a hearing that the affidavit contains a false statement made knowingly or intentionally, or with reckless disregard for the truth. 438 U.S. at 155–56, 98 S.Ct. at 2676; *Davis,* 144 S.W.3d at 201. Then, setting the false material aside, the movant must also show that the affidavit's remaining content is insufficient to establish probable cause. 438 U.S. at 155–56, 98 S.Ct. at 2676; *Davis,* 144 S.W.3d at 201.

## B. Analysis

The probable cause portion of the affidavit prepared by Officer Dilbeck reads as follows, in pertinent part:

On 81704 at approx. 1530 hours Affiant and Officer John Spragins were flying in an Air National Gaurd [sic] helicopter in Montague County, Texas. Officers were looking for the illegal growing of marijuana in this area. As officers flew over the property and residence of Fenoglio they observed several marijuana plants growing. The plants were in large plastic containers and located near the residence. A dirt roadway leads from the residence directly to the location of the marijuana plants. A large bucket filled with water containing a plastic scoop was next to the plants as someone has been tending and watering the marijuana plants.

Affiant has received specialized training in the detection of growing marijuana plants and has spotted marijuana plants from the air in the past. Upon detecting the plants Affiant and Officer Spragins landed in the helicopter near the plants for confirmation. The marijuana plants were in plain view from the air and Affiant immediately identified the plants as marijuana. Affiant called for assistance from members of the North Texas Drug Task Force and Montague County Sheriff's Office. The marijuana plants were secured and a search warrant was obtained.

Affiant believes that more marijuana may be located in the residence.

■ Appellant first contends that Officer Dilbeck's statement that the officers had to land the helicopter for "confirmation" belies his other statements that the

plants were in plain view because if the officers had to confirm the presence of marijuana, Officer Dilbeck could not have "immediately identified the plants as marijuana" as he claimed. At the suppression hearing, Officer Dilbeck testified that the purpose of landing the helicopter by the plants was "[t]o secure them." He also explained that the officers landed to make sure that no one "messed with" the marijuana; he did not know at the time whether anyone was in the house or otherwise on the property at the time. He never deviated from his testimony that the marijuana plants were in plain view from the air and that he was able to recognize them from the air as marijuana.

In findings of fact, the trial court found that "according to the face of the affidavit," the officers observed the marijuana growing in plain view before they landed the helicopter on the property and "[t]hat landing the aircraft on the premises was done *for the purpose of securing the premises* prior to obtaining a search warrant, and that no search of the premises by any law enforcement officer began prior to their having obtained and executed the search warrant for the premises." [Emphasis added.] Deferring to the trial court's assessment of Officer Dilbeck's credibility, as we must under the applicable standard of review, we conclude that the trial court did not err by denying the motion to suppress on the ground that Officer Dilbeck's statements that the plants were in plain view and that he immediately identified them from the air were false.

■ Appellant additionally contends that Officer Dilbeck's statement that the plants were "near" the residence is false and that Officer Dilbeck knowingly, intentionally, or recklessly included that statement in the affidavit. Appellant points to Officer Dilbeck's testimony that the plants were two hundred to two hundred fifty feet away from the residence and that a person could probably not see the plants from the house.

Officer Dilbeck testified at the suppression hearing that the plants were two hundred to two hundred fifty yards away from the house, or about two football fields. He agreed that the plants were separated from the house by a tree line and that a person probably could not see the plants from the house. Although Officer Dilbeck did not include specifics in the affidavit as to how far away the plants were from the house, he did indicate that "[a] dirt roadway leads from the residence directly to the location of the marijuana plants," so the affidavit included information showing that the plants were not located in the backyard, porch, or similar location. Officer Dilbeck testified at the suppression hearing that the road was not paved or blacktop, but it was obviously traveled; he agreed that it could be characterized as a "beaten path." He also testified that the "dirt road, a trail, ... led from the back part of [appellant's] house to a row of large hay bales" next to which the marijuana was planted. According to Officer Dilbeck, "somebody was definitely tending to the plants because the plants were in very good condition." Appellant introduced photographs into evidence at the suppression hearing that confirm Officer Dilbeck's testimony about the location of the plants.

The trial court found "[t]hat the growing marihuana plants seized pursuant to the search warrant were located by or on a pathway that leads to the residence and on to Hundley Road and that, therefore, the location of the plants was connected to the residence." It also found that Officer Dilbeck's statement in the affidavit that the plants were "near" the residence was not false. We defer to the trial court's conclusion; it is apparent from the affidavit that the plants were not immediately adjacent

to the house and that a person would have to travel by some means to reach them. In addition, Officer Dilbeck's testimony and the photographs of the plants show that they were healthy, were being tended, and could easily have been accessed from the house via the dirt path. Furthermore, Officer Dilbeck testified that the only access to the plants was via this path between the house and the plants and that there was no other way to get water to the plants.[5] We hold that the trial court did not err by denying the motion to suppress on the ground that Officer Dilbeck's statement that the plants were "near" the house was false.

Appellant's contention that the search of the truck was illegal is based on his *Franks* arguments above; because we hold that the trial court did not err by denying suppression of the drugs on those grounds, we reject appellant's argument that the search of the truck was based on an illegal search warrant.[6] We overrule appellant's first point.

### III. Motion for Mistrial

In his second point, appellant contends that the trial court erred by denying his motion for mistrial and objection based on an unqualified juror serving on the jury at both guilt-innocence and punishment.

Immediately after the trial court's announcement of the jury's decision regarding punishment on all three offenses, the trial court questioned a juror about whether he actually lived in Oklahoma rather than in Montague County. The juror told the judge that he lived in Ringgold,[7] but that he used to live in Terral[8] and had a house there. He said he had been living in Ringgold between three and six months before trial.[9] Upon further questioning, however, the juror stated that he had actually lived in Terral for the last four to five years but that he worked in Texas during the day, he had a Texas driver's license, and his truck had Texas tags. The juror further said that he rented a P.O. box in Texas and that all his mail went to the Texas address. He was also registered to vote in Texas. Although appellant's counsel asked questions of the juror, he did not file a motion for mistrial until almost two months later, prior to the trial court's sentencing appellant.

The code of criminal procedure provides that a person is disqualified to serve as a juror in a criminal case if he or she "is not a qualified voter in the state and county under the Constitution and laws of the state." TEX.CODE CRIM. PROC. ANN. art. 35.16(a)(1) (Vernon 2006). The government code requires a juror to be "a citizen of this state and of the county in which the person is to serve as a juror." TEX. GOV'T CODE ANN. § 62.102(2) (Vernon Supp.2007).

The failure to make a timely objection to a juror's qualifications waives the right to challenge those qualifications. *Mayo v. State*, 4 S.W.3d 9, 12 (Tex.Crim. App.1999); *Collum v. State*, 96 S.W.3d 361, 366 (Tex.App.-Austin 2002, no pet.). The statutory qualifications for jurors are not absolute and can be waived. *Mayo*, 4

---

5. There was no irrigation system near the plants.

6. The search warrant applied to appellant's property, as well as any structures or vehicles found on the property. *See* discussion, *supra*, at pages 18–19.

7. Ringgold is located in Montague County. *See* Tex. State Historical Ass'n, *Ringgold, Tex.*,

HANDBOOK OF TEX. ONLINE, http://www.tshaonline.org/ handbook/online/articles/RR/hlr21.html (last visited Feb. 19, 2008).

8. Terral is located in Oklahoma, close to Montague County, Texas. *See Ex parte Sutton*, 455 S.W.2d 274, 276 (Tex.Crim.App.1970).

9. He said he lives with friends in Ringgold.

S.W.3d at 12; *Collum*, 96 S.W.3d at 366. "[E]ven if an absolutely disqualified juror sits on a criminal jury, reversal of the conviction is permitted only if the defendant timely objected at trial or shows significant harm on appeal." *Mayo*, 4 S.W.3d at 12.

■■■■ Rule 33.1(a)(1) of the Texas Rules of Appellate Procedure provides that, as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely and specific request, objection, or motion. TEX.R.APP. P. 33.1(a)(1); *Griggs v. State*, 213 S.W.3d 923, 927 (Tex.Crim.App.2007), *cert. denied*, — U.S. ——, 128 S.Ct. 153, 169 L.Ed.2d 105 (2007). Under rule 33.1(a)(1), a motion for mistrial must also be both timely and specific. TEX.R.APP. P. 33.1(a)(1); *Griggs*, 213 S.W.3d at 927; *Young v. State*, 137 S.W.3d 65, 65–66 (Tex. Crim.App.2004). A motion for mistrial is timely only if it is made as soon as the grounds for it become apparent. *Griggs*, 213 S.W.3d at 927. Error in seating a juror who is not a resident of the county is waived by failing to inquire about jurors' residency status during voir dire and by failing to make a challenge for cause at that time. *Gaona v. State*, 733 S.W.2d 611, 618 (Tex.App.-Corpus Christi 1987, pet. ref'd).

Appellant contends that his objection "was made at the earliest possible time prior to any further proceedings taking place." But appellant waited almost two months after the trial court's questioning of the juror before moving for a mistrial. We hold that appellant's motion for mistrial was not timely; thus, appellant failed to preserve this issue for our review. *See Griggs*, 213 S.W.3d at 927. We overrule appellant's second point.

## IV.  Allegations of Jury Misconduct

■■■ In his third point, appellant challenges the trial court's denial of his motion for new trial on the grounds that the jury violated the trial court's mandatory instructions not to consider how parole might apply to appellant and that during the jury's deliberations, a juror discussed his personal knowledge of the parole process.

On October 25, 2006, appellant filed a motion for new trial, in which he alleged that the jury improperly discussed the effects that parole would have on appellant's sentence and that a juror had "offered personal experiences to help guide the jury in its deliberation on how parole usually works on a sentence." At the hearing on the motion, appellant attempted to introduce into evidence an affidavit from defense counsel, which included the following, in pertinent part:

> Following [appellant's] sentencing on September 29, 2006, letters were sent to each of the jury members inquiring as to certain activities that may have taken place during the course of the trial. Attached hereto as Exhibit "1" is a letter forwarded to [one of the jurors]. . . . The answers of [the juror] clearly show the jury committed misconduct in considering issues that they were instructed not to use in reaching a verdict either in the guilt/innocence or punishment phase.

Attached to the affidavit is the letter questionnaire to the juror, with the juror's handwritten answers. To the question asking, "Was there any discussion regarding the effect that parole would have on a sentence," the juror answered yes. To the question, "Did any other juror offer any personal experience to help guide the jury in its deliberation?", the juror answered, "[O]nly how parole usually works [regarding] a sentence."

The State objected to the admission of the affidavit and letter under rule 6.06(b) of the rules of evidence, which provides that

[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

TEX.R. EVID. 606(b). The trial court admitted the affidavit but not the letter. The trial court then denied appellant's motion for new trial.

■ The plain language of rule 606(b) indicates that an outside influence is something outside of both the jury room and the juror. *White v. State,* 225 S.W.3d 571, 574 (Tex.Crim.App.2007). Here, the juror's answers to the questionnaire clearly relate to the jury's deliberation and not to any outside influence. Nor do they relate to a claim that a juror was unqualified to serve. Accordingly, the trial court did not err by refusing to admit the juror's answers to the questionnaire. *See id.* at 574–75. And the affidavit alone does not show grounds for granting a new trial. *See* TEX.R.APP. P. 21.3 (listing grounds upon which new trial must be granted). Accordingly, we overrule appellant's third point.

## V. Double Jeopardy Allegation

■ In his fourth and final point, appellant claims that he received multiple punishments for the same offense, possession of a controlled substance, in violation of the Double Jeopardy Clause of the United States Constitution. Although appellant's two convictions for possession of methamphetamine were for different amounts, he contends that "multiple possessions of ... methamphetamine would all add up to the same offense which would prevent a prosecution of ... [a]ppellant on more than one indictment alleging methamphetamine on the same date." Appellant was indicted for and convicted of possession of methamphetamine of at least four but less than two hundred grams—which the State contends is the amount of methamphetamine the officers found when they searched appellant's truck—and possession of four hundred or more grams of methamphetamine—which the State contends is the amount of methamphetamine found in appellant's house.

■ The Double Jeopardy Clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense. U.S. CONST. amend. V; *Ex parte Cavazos,* 203 S.W.3d 333, 336 (Tex. Crim.App.2006). Generally, this clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *Cavazos,* 203 S.W.3d at 336.

■ "A defendant suffers multiple punishments in violation of the Double Jeopardy Clause when he is convicted of more offenses than the legislature intended." *Ervin v. State,* 991 S.W.2d 804, 807 (Tex.Crim.App.1999). The legislature de-

termines whether offenses are the same for double jeopardy purposes by defining the "allowable unit of prosecution." *Cavazos,* 203 S.W.3d at 336. Thus, to determine the scope of the Double Jeopardy Clause's protection against multiple punishments in a particular case, we must ascertain the allowable unit of prosecution for an offense. *See id.*

▮ To prove unlawful possession of a controlled substance, the State must prove that the accused exercised control, management, or care over the substance and that he knew the matter possessed was contraband. TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(38) (Vernon Supp.2007), 481.115 (Vernon 2003); *Joseph v. State,* 897 S.W.2d 374, 376 (Tex.Crim.App.1995); *Tucker v. State,* 183 S.W.3d 501, 510 (Tex. App.-Fort Worth 2005, no pet.). In possession-oriented offenses, the proscribed item is the allowable unit of prosecution. *Ex parte Gonzalez,* 147 S.W.3d 474, 477–78 (Tex.App.-San Antonio 2004, pet. ref'd), *cert. denied,* 546 U.S. 1182, 126 S.Ct. 1358, 164 L.Ed.2d 69 (2006); *see also Watson v. State,* 900 S.W.2d 60, 62 (Tex.Crim.App. 1995) (holding that possession of two different Penalty 1 substances, i.e., heroin and cocaine, with intent to deliver constituted two separate offenses). Thus, in this case, the allowable unit of prosecution is the methamphetamine. *See Ex parte Hill,* 48 S.W.3d 283, 287–88 (Tex.App.-San Antonio 2001, pet. ref'd).

Appellant contends that the methamphetamine found in the truck and house must be considered together, so that he could be convicted and punished only for the greater offense of possession of four hundred or more grams of methamphetamine. The State contends that the two convictions are for separate offenses because they are for "different quantities of methamphetamine possessed by [a]ppellant at different locations on the same date." According to the State,

[t]he key question is whether the legislature intended to allow prosecution for both the possession of methamphetamine in the pickup and that taken from the residence as two separate offenses. The only consistent answer to the question is that the intent of the legislature must have been to allow prosecution of both offenses if they are committed as distinctly separate acts. In this case, [a]ppellant possessed distinctly different quantities of the same controlled substance at two different locations at the same or nearly the same time.

Here, the officers encountered appellant in his truck at the entrance gate to appellant's property when they arrived there to serve the warrant. Appellant stopped when the officers identified themselves; they told him they had a search warrant for the property. The warrant authorizes law enforcement to enter the "suspected place and premises" and search for the property described in the affidavit; it also authorizes law enforcement to arrest any person described and accused in the affidavit. The affidavit describes the premises to be searched as follows:

a wood framed two story brick home located on Hundley Road in Montague County, Texas.... *Scope of search to include any out buildings and all property.*

. . . .

Said suspected place and premises, in addition to the foregoing description, also includes all other buildings, structures, places, *vehicles on said premises and within the curtilage* ... that are found to be under control of the suspected party named below [appellant] and in, on, or around which said suspected party may reasonably reposit or secrete property that is the object of the search requested herein. [Emphasis added.]

It also accuses appellant of being in possession of marijuana and asks for the issu-

ance of a warrant for appellant's arrest. Thus, the warrant authorized the search of not only the property but also the arrest of appellant and the search of appellant's vehicle. Officers Dilbeck and Spragins did not articulate any independent reason for searching appellant's truck.

Because the allowable unit of prosecution in this case is the methamphetamine, and because appellant's possession of all of the methamphetamine was in the course of the same transaction and seized by the officers within the context of serving the search and arrest warrant as to appellant and all of his similarly-located property, we conclude and hold that appellant's possession of the methamphetamine in the truck and in the house were not separate offenses. *See Sikes v. State,* 169 Tex. Crim. 443, 334 S.W.2d 440, 441–42 (1960) (holding that possession of three marijuana cigarettes in car and three in apartment constituted one continuous transaction, not two separate offenses, when, based on tip, officers pulled over car and found marijuana, then, when appellant indicated he had more marijuana, followed appellant to his apartment "15 or 20 blocks away"); *Glaze v. State,* 165 Tex.Crim. 626, 310 S.W.2d 88, 89–90 (1958) (holding that possession of marijuana in apartment and in car constituted one offense when officers served search warrant for car and appellant admitted to possessing marijuana in apartment); *Hill,* 48 S.W.3d at 286–87 (holding that driver's possession of cocaine residue

in shirt pocket and possession of three rocks behind passenger seat constituted one possession offense and driver could not be prosecuted twice for such possession); *see also Powell v. State,* 502 S.W.2d 705, 709 (Tex.Crim.App.1973) (citing *Sikes* and *Glaze* in concluding that possession of marijuana in two different locations constituted continuous transaction and not separate offense). Thus, subjecting appellant to two sentences for the single offense of possession of methamphetamine violates the Fifth Amendment double jeopardy prohibitions in this instance. *See Cavazos,* 203 S.W.3d at 337. We sustain appellant's fourth point.

## Conclusion

 Having overruled appellant's first three points, we affirm the trial court's judgment as to appellant's convictions and sentences for possession of four hundred grams or more of methamphetamine and possession or transportation of anhydrous ammonia with the intent to manufacture methamphetamine. But having sustained appellant's fourth point, we reverse appellant's conviction for possession of methamphetamine of at least four but less than two hundred grams and render a judgment of acquittal as to that offense only.[10] *See Rangel v. State,* 179 S.W.3d 64, 75 (Tex.App.-San Antonio 2005, pet. ref'd).

---

10. When an appellant is convicted of two offenses that are the same for double jeopardy purposes, we retain the conviction for the most serious offense, which is the offense of conviction for which the greatest sentence was assessed. *Id.* at 337–38. Here, that is the sentence of twenty years' confinement for possession of four hundred or more grams of methamphetamine. *See* Tex. Health & Safety Code Ann. §§ 481.115(d) (providing that possession of Penalty 1 controlled substance with weight of four grams or more but less than

two hundred grams is punishable as second degree felony), 481.115(f) (providing that possession of Penalty 1 controlled substance with a weight of four hundred or more grams is punishable by confinement for "life or for a term or for a term of not more than 99 years or less than 10 years, and a fine not to exceed $100,000"). Moreover, if the State had originally charged both offenses as one, the proper offense, based on weight, would have been possession of four hundred or more grams.