# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00343-CR

**Kevin Lamar Warren, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT NO. 64414, THE HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following the denial of his pretrial motions to suppress, appellant Kevin Lamar Warren pled guilty, pursuant to a plea bargain, to possession of 400 grams or more of a controlled substance with intent to deliver, and was sentenced to 45 years in the Texas Department of Criminal Justice. *See* Tex. Health & Safety Code § 481.112(a), (f). On appeal, appellant raises three points of error complaining about the trial court's denial of his motions to suppress. Finding no error in the trial court's ruling, we affirm the judgment of conviction.

## BACKGROUND

Officers from the Killeen Police Department went to 3701 YS Pak Court, Apartment H, to search for a female fugitive who had listed that address on her bail bond records. Two officers approached the front door of the residence while another officer covered the rear of the residence. As they approached the front door, an adult male, later identified as Terrance Ford,

opened the inner door behind the outer security door.[1] The officers could immediately smell the distinctive odor of burning marijuana coming from inside the apartment and could see lingering smoke inside the room.

The officers, in standard police uniform, identified themselves to Ford and advised him that they were looking for the fugitive female. Ford informed them that she did not live there and he did not know who she was. To further investigate the fugitive's whereabouts, one of the officers, Officer Richard Bradley, asked Ford to produce identification. The officer could see two other males, later identified as the appellant, Kevin Lamar Warren, and his brother, Keith Lamar Warren, in the living room. After the officer's request for identification, Ford walked back into the living room area and Officer Bradley saw all three men immediately go into the kitchen. The officer could not see into the kitchen but heard shuffling and movement noises coming from the kitchen area. Ford returned to the door without identification. When Officer Bradley again asked for identification, Ford went upstairs indicating he needed to retrieve it from there.

Becoming concerned for officer safety, Officer Bradley tried the security door and found it to be locked. Ford then returned downstairs, still without identification. The officer asked a third time for identification and Ford retrieved a photo identification from a cigar box on the television just inside the doorway. Ford then removed keys from his pocket, unlocked the security door, opened the door, stood aside, and motioned for the officers to enter the apartment.[2] The

---

[1] The record reflects that this outer security door, called the "burglar bar door" by the parties, consisted of metal bars and a mesh screen that allowed the passage of air.

[2] This testimony was contradicted at the suppression hearing by Ford's testimony. Ford testified that he only unlocked and opened the security door to provide the officer with his identification but Officer Bradley put his foot in the door, pulled the door open, and, along with the

2

officers entered the apartment and Officer Bradley again advised the men that they were looking for the female fugitive. He also asked about the marijuana smoke in the room. At that point, Ford produced a baggie of marijuana and gave it to Officer Bradley, stating that it was all that they had. The men indicated that they had been smoking it while watching a game on television.

Concerned that all three men had quickly gone into the kitchen as soon as they heard the name of the fugitive the police sought, and unaware of whether others were present in the apartment, Officer Bradley went into the kitchen area to check for the fugitive and conduct a protective sweep. Upon entering the kitchen, the officer immediately saw a large Pyrex measuring cup that contained a milky white liquid next to the sink. He also observed that one of the doors to a cabinet above the stove was open and inside he saw a box of Ziploc baggies, a digital scale, and a clear plastic container that had a white powder residue on it. There was a portion of the kitchen cabinetry that formed an elbow or L shape and, based on his prior experience of finding a person concealed in such a cabinet, Officer Bradley believed it might be large enough to hide a person. He opened the cabinet door to check and saw an open shoe box containing four Pyrex measuring cups with a white crusty residue on them. From his years of law enforcement experience, the officer recognized the items he observed in the kitchen as those used in the manufacture of crack cocaine. At this time, Officer Bradley terminated any further protective sweep of the kitchen or apartment.

After consulting with his sergeant, Officer Bradley notified Detective Carl Pergande, a detective with the Killeen Police Organized Crime Unit, who, based in part on the observations of Officer Bradley, obtained a warrant to search Ford's apartment. During the search conducted

---

other officer who had her gun drawn, forced his way into the apartment.

pursuant to that warrant, officers discovered 3.2 kilograms of cocaine, 602 grams of marijuana, 330 grams of promethazine, a hand gun, and various drug paraphernalia. This discovery, in combination with additional police investigation, prompted the officers to obtain a subsequent search warrant for another apartment located in the same complex, Apartment C, where appellant resided. The search conducted pursuant to that warrant yielded an additional 30 grams of cocaine, another handgun, and more drug paraphernalia.

Ford, appellant, and appellant's brother were arrested that night and subsequently each charged by indictment with possession of 400 grams or more of a controlled substance, namely cocaine, with intent to deliver. All three filed separate motions to suppress, and each adopted the motions filed by his co-defendants. The motions were consolidated for the suppression hearing.[3] The trial court denied all of the defense motions to suppress.[4]

## DISCUSSION

### Warrantless Entry and Search

In his first point of error, appellant asserts that Officer Bradley exceeded the scope of a valid protective sweep and thus the trial court erred in failing to suppress the evidence derived

---

[3] The trial court actually conducted two hearings on the motions to suppress. In the first hearing, the defendants sought to suppress evidence derived from the warrantless entry into Ford's apartment. In the second hearing, conducted on two separate days, the defendants sought to suppress evidence seized during the searches of Ford's apartment and appellant's apartment that were conducted pursuant to the subsequently obtained search warrants.

[4] Three of appellant's six motions to suppress sought to suppress evidence obtained from the searches of the defendants' cell phones. The State elected not to use any evidence or information derived from the cell phones, so appellant does not complain about the denial of those three motions on appeal.

4

from the warrantless entry into Ford's apartment. In his second point of error, appellant argues that because the search warrants were based on evidence derived from the warrantless search of Ford's apartment by Officer Bradley, the trial court erred in failing to suppress the evidence obtained during the subsequent searches of Ford's apartment and his apartment pursuant to those search warrants.[5]

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion, applying a bifurcated standard of review where we give almost total deference to a trial judge's findings of historical fact and credibility determinations that are supported by the record, but review questions of law de novo. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013); *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We will affirm the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

---

[5] Although not at issue in this appeal, we note that there is some question as to whether appellant has standing to contest the search of Ford's apartment. *See State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) ("The rights secured by the Fourth Amendment and Article I, Section 9, are personal, and accordingly, an accused has standing to challenge the admission of evidence obtained by an 'unlawful' search or seizure only if he had a legitimate expectation of privacy in the place invaded."); *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004) ("[A defendant] has no standing to complain about the invasion of someone else's personal rights."). At the suppression hearing, the State "waive[d] standing," apparently based on the fact that the probable cause affidavit and search warrant for Ford's apartment asserted that the premises was "in charge of and controlled by" all three men. *See Betts*, 397 S.W.3d at 203 (whether defendant was legitimately in place invaded and whether he had complete dominion or control and right to exclude others are circumstances of search to be examined in determining whether defendant has demonstrated objectively reasonable expectation of privacy); *but see Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (legitimate privacy expectation of overnight guest does not extend to casual visitor or guest who is merely present with consent of homeowner). We do not address the issue of whether appellant had standing to contest the search.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011); *see* U.S. Const. amend. IV; *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). The entry into a residence by police officers is a "search" for purposes of the Fourth Amendment. *Limon*, 340 S.W.3d at 756; *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010). A warrantless police entry into a residence is presumed unreasonable unless the entry falls within one of a well-defined group of exceptions. *Limon*, 340 S.W.3d at 756; *Valtierra*, 310 S.W.3d at 448.

Voluntary consent is one such exception. *Rodriguez*, 497 U.S. at 181; *Limon*, 340 S.W.3d at 756; *Valtierra*, 310 S.W.3d at 448. An owner's or occupant's voluntary consent makes the entry into a residence by police officers constitutionally "reasonable." *Rodriguez*, 497 U.S. at 181; *Valtierra*, 310 S.W.3d at 448. Consent may be given orally or by action, or may be shown by circumstantial evidence. *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011); *Valtierra*, 310 S.W.3d at 448. The validity of an alleged consent to search is a question of fact to be determined from the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Weaver*, 349 S.W.3d at 526; *Valtierra*, 310 S.W.3d at 448. The State must prove voluntary consent by clear and convincing evidence. *Weaver*, 349 S.W.3d at 526; *Valtierra*, 310 S.W.3d at 448.

At the suppression hearing, the trial court heard testimony from Officer Bradley that Ford invited the officers into his apartment by unlocking the security door, opening the door, motioning for the officers to come in, and stepping back to accommodate their entry. At a suppression hearing, the trial judge is the sole trier of fact and exclusive judge of the credibility of

the witnesses and the weight to be given to their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Further, unless the trial court abuses its discretion by making a finding unsupported by the record, we defer to the trial court's findings of fact and will not disturb them on appeal. *State v. Johnson*, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011); *Guzman*, 955 S.W.2d at 89; *Miller v. State*, 335 S.W.3d 847, 854 (Tex. App.—Austin 2011, no pet.). The trial court made fact findings and conclusions of law that Officer Bradley was lawfully at Ford's apartment to look for the female fugitive and that he properly entered the apartment only after being invited into the residence by Ford. *See Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (consent to enter home could be inferred from defendant's action of motioning officer to come forward). These findings are supported by the record.

Consent to enter a residence, however, does not, without more, provide consent for a police officer to search the entire residence or objects therein. *Valtierra*, 310 S.W.3d at 448. The scope of a search is usually defined by its expressed object. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Weaver*, 349 S.W.3d at 526. The "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251; *Weaver*, 349 S.W.3d at 526.

Here, Ford invited the police officers into his apartment during a conversation in which he was advised that the police were at his apartment looking for a female fugitive. Based on the exchange between Officer Bradley and Ford, a reasonable person would have understood that

7

the purpose for which the officers entered the apartment, with Ford's permission, was to search for the fugitive. After entering the apartment, Officer Bradley reiterated the officers' purpose of searching for the fugitive. He then went into the kitchen—the area where he saw the men go immediately after he initially advised Ford they were looking for the fugitive and where he then heard shuffling and movement—to check for the fugitive. The officer saw contraband in plain view and observed a kitchen cabinet that he thought might possibly conceal a person. He opened the cabinet to check for the fugitive and found additional contraband, and immediately ceased this activity. He did not search the kitchen or apartment any further. His search was consistent with the consent Ford gave when he invited the officers into his apartment knowing they were looking for the fugitive. *See Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012) ("If an officer is invited or permitted to come into a house for a particular purpose (such as to look for a particular person or object), the scope of the consent to enter normally includes consent to search those areas in which the person or object would reasonably be found." (quoting *Valtierra*, 310 S.W.3d at 450)).

Another exception to the necessity of a search warrant is a "protective sweep" performed by police officers. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep is a "quick and limited search of premises . . . conducted to protect the safety of police officers or others." *Reasor v. State*, 12 S.W.3d 813, 815 (Tex. Crim. App. 2000). The sweep must not be a "full search of the premises" and the searching officers must possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 816.

8

Appellant argues that even if the officers were initially present in Ford's apartment for valid law enforcement purposes after being invited in,"those officers' subsequent observations in the apartment, including plain view observations of narcotics and paraphernalia in the residence, were outside the purview of a 'protective sweep' of the property[.]" He contends that Officer Bradley's sweep should have been completed once he determined that no one was in the kitchen.[6] He further asserts that Officer Bradley failed to articulate specific facts sufficient to justify an expanded protective sweep.[7] Specifically, appellant complains that there was no evidence demonstrating that the female fugitive the police sought was "armed and dangerous" or that the men in the apartment "were loud, profane, abusive, or aggressive." He further observes that the evidence reflected that none of the officers "even felt the need to draw weapons."

However, Officer Bradley testified that as he approached the apartment, the inner door was opened and he smelled the odor of burning marijuana and saw lingering smoke inside. Once he advised Ford that they were looking for the female fugitive, he saw Ford and the two other men move quickly into the kitchen, where he was unable to observe them, and he then heard shuffling and movement. After entry into the apartment on Ford's invitation, the three men admitted smoking marijuana and Ford produced more of the illegal substance. Officer Bradley expressed that under these circumstances—the quick retreat to the kitchen in response to the mention of the

---

[6] We note, however, that in his testimony the officer expressed that he was concerned about concealed persons. He explained during cross-examination that his initial scan of the kitchen showed that there was no one "in the open" who could compromise his safety and that there was no threat to his safety "[t]hat could be seen."

[7] In his argument, appellant appears to suggest that there were two entries into the kitchen by Officer Bradley. First, to scan with his flashlight, then later to open the cabinet. However, the record demonstrates a single entry by the officer into the kitchen.

9

fugitive's name, the noises he subsequently heard coming from that area, and the presence of narcotics—he determined that he needed to perform a security sweep for officer safety. The officer testified to specific and articulable facts permitting the trial court to find that the officer had an objectively reasonable belief that a person in the kitchen posed a danger to him or other persons in the apartment, justifying his entry into the kitchen for a brief search for any other persons present. *See Ramirez v. State*, 105 S.W.3d 730, 743 (Tex. App.—Austin 2003, no pet.) (officer was permitted to sweep garage room in order to establish that no individuals were present). Officer Bradley's search was limited to a protective sweep of the kitchen area—where the men scurried and he heard the suspicious activity—and was limited to those places where he believed a person may be found.

In addition to the fact findings and conclusions of law discussed previously, the trial court made fact findings and conclusions that Officer Bradley (1) properly opened the kitchen cabinet door to search for a concealed person, (2) conducted a proper protective sweep of the interior of the apartment, and (3) made proper plain-view observations of narcotics and narcotics paraphernalia. The court further concluded that the observations Officer Bradley made established probable cause for the search warrant of Ford's apartment and that the subsequent search of Ford's apartment, along with the police investigation conducted in connection with that search, yielded additional information and evidence that established probable cause to search Apartment C, appellant's apartment. *See State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012) (probable cause exists when, under totality of circumstances, there is fair probability that contraband or evidence of crime will be found at specified location at time warrant is issued). The record supports these findings and conclusions.

10

Viewed in the light most favorable to the trial court's ruling, the record reflects that Ford invited the police into his apartment when they advised him that they were searching for the female fugitive and that once inside Officer Bradley's search did not exceed the permissible scope of Ford's consent nor that of a protective sweep. The search conducted during the protective sweep and pursuant to Ford's consent yielded evidence sufficient to establish probable cause to obtain a search warrant for Ford's apartment. The execution of that search warrant yielded further evidence that, together with information obtained in the course of the connected police investigation, established probable cause to obtain a search warrant for appellant's apartment. Therefore, we conclude that the trial court did not abuse its discretion in denying appellant's motions to suppress. We overrule appellant's first two points of error.

### *Franks* Claim

In his third point of error, appellant contends that the evidence seized from his apartment, Apartment C, should have been suppressed because Detective Pergande's search-warrant affidavit contained a false statement that was made knowingly and intentionally. Specifically, appellant challenges the statement in the affidavit that reflects that his brother, Keith Warren, was listed as the account holder on the water bill when in fact his name was on the water account.

The Fourth Amendment requires that a defendant be allowed to challenge the veracity of a probable cause affidavit "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *see Emack v. State*,

11

354 S.W.3d 828, 837 (Tex. App.—Austin 2011, no pet.). To require the trial court to hold a *Franks* evidentiary hearing and to preserve the issue for appellate review, a defendant must (1) allege deliberate falsehood or reckless disregard for the truth by the affiant, specifically pointing out the portion of the affidavit claimed to be false; (2) accompany these allegations with an offer of proof stating the supporting reasons; and (3) show that, when the portion of the affidavit alleged to be false is excised from the affidavit, the remaining content is insufficient to support the issuance of the warrant. *Harris v. State*, 227 S.W.3d 83, 85–86 (Tex. Crim. App. 2007); *Cates v. State*, 120 S.W.3d 352, 356 (Tex. Crim. App. 2003). Specific allegations and evidence must be apparent in the pleadings in order for a trial court to even entertain a *Franks* proceeding. *Harris*, 227 S.W.3d at 85.

Initially, we note that appellant did not meet the requirements necessary to obtain a *Franks* hearing in the trial court. He merely made the following assertion in his two motions to suppress complaining that the search warrant affidavits lacked probable cause:

> The search warrant was illegally issued because the issuing magistrate was misled by information in the affidavit that the affiant officer knew was false or would have known was false except for his reckless disregard for the truth.

There is no mention of what specific portion of Detective Pergande's affidavit was allegedly false, nor any offer of proof to contradict whatever that alleged misrepresentation was. This conclusory assertion falls far short of what is required under *Franks* and does not satisfy the pleading and evidentiary requirements for obtaining a *Franks* hearing. *See Harris*, 227 S.W.3d at 85; *see also Franks*, 438 U.S. at 171 ("To mandate an evidentiary hearing, the challenger's attack must be more

12

than conclusory and must be supported by more than a mere desire to cross-examine."). Nevertheless, although we are not convinced that appellant made a "substantial preliminary showing" under *Franks*, the trial court opted to address his *Franks* complaint. Because the trial court reached this issue, we will review its findings and conclusions. The question then becomes whether appellant met his burden of proving a knowingly false statement. We conclude he did not.

An affidavit supporting a search warrant begins with a presumption of validity. *Cates*, 120 S.W.3d at 355. An appellant has the burden of establishing by a preponderance of the evidence the allegation of perjury or reckless disregard for the truth. *Franks*, 438 U.S. at 156; *Harris*, 227 S.W.3d at 85; *Emack*, 354 S.W.3d at 838; *see also Fenoglio v. State*, 252 S.W.3d 468, 472–73 (Tex. App.—Fort Worth 2008, pet. ref'd). We review the trial court's ruling on a *Franks* claim under the same standard applied to search-and-seizure issues generally: we give almost total deference to the court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor, but we review de novo the trial court's application of the law to those facts. *Emack*, 354 S.W.3d at 838; *Jordan v. State*, 271 S.W.3d 850, 854 (Tex. App.—Amarillo 2008, pet. ref'd); *Fenoglio*, 252 S.W.3d at 473; *see Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

As we review the record to determine whether appellant met his burden of showing deliberate falsity or reckless disregard for the truth, we are mindful that the Fourth Amendment requires a truthful factual showing when determining probable cause. *See Franks*, 438 U.S. at 164–65. "Truthful," however, does not mean that every fact recited in the affidavit must be precisely accurate, "for probable cause may be founded upon hearsay and upon information received from

13

informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165. Rather, "truthful" in this context means that the information put forth in the affidavit is believed or appropriately accepted by the affiant as true. *Id.*; *Clement v. State*, 64 S.W.3d 588 (Tex. App.—Texarkana 2001, pet. ref'd); *see Janecka v. State*, 937 S.W.2d 456, 462 (Tex. Crim. App. 1996). If the statement in the search-warrant affidavit that is claimed to be false or made in reckless disregard for the truth only evidences an instance where the police have been merely negligent or mistaken in checking or recording the facts relevant to a probable-cause determination, it is beyond the scope of *Franks*. *Dancy v. State*, 728 S.W.2d 772, 783 (Tex. Crim. App. 1987) (misstatement in affidavit that is result of simple negligence or inadvertence will not invalidate warrant); *see Franks*, 438 U.S. at 171 ("[a]llegations of negligence or innocent mistake are insufficient" to warrant striking portions of affidavit).

Here, the evidence showed that as part of the police investigation Detective Eureka Williams contacted a Public Service Officer at the Killeen Police Department to check the registered water listing for Apartment C at 3700 YS Pak Court and found that it returned to Kevin Warren. Detective Williams testified that she conveyed that information to Detective Joel Wadley. Detective Wadley testified that he conveyed information that Keith Warren was the registered account holder to Detective Pergande because that is what Detective Williams told him. Detective Pergande testified that based on information he received from Detective Wadley, he stated in his affidavit that the water listing for Apartment C returned to Keith Warren.

Appellant asserts that the detectives intentionally provided the wrong name, but he offered no proof to that effect at the suppression hearing. There was no showing during the

14

suppression hearing that any of the detectives' statements were made with the type of knowledge, intent, or recklessness contemplated by *Franks*. In fact, appellant never established that Detective Pergande was aware that his statement concerning the name on the water account was incorrect at the time he included the statement in his affidavit. Detective Pergande testified that he only found out about the error two days after obtaining the warrant. Detective Wadley testified that "[he thought]" he told Detective Pergande about the mistake in the names but not before the warrant was issued.

Appellant asserts that the fact that the officers did not attempt to correct the affidavit or seek a new warrant when they discovered the mistake (after the search warrant was issued but before the search was conducted) demonstrates that the officers acted "with a wanton and reckless disregard for the truth." However, Detective Pergande's testimony reflected that, contrary to knowingly making a false statement or one in disregard of the truth, he stated information in his affidavit that he believed to be correct and truthful:

> Q. You then state that we checked the water listing and found it returned to account holder of Keith Warren, correct?
>
> A. Yes.
>
> Q. At the time you received this information you believe[d] it to be factual and accurate?
>
> A. Yes.

The trial court made the following fact finding and conclusion concerning the error in the name:

15

There was an incorrect statement in the Affidavit for Probable Cause in support of the search warrant for 3700 #C YS Pak regarding the name the water listing was in for the residence. The incorrect statement was an inadvertent mistake. The mistake was not an intentional misrepresentation, not an intentional lie, and there was no wanton or reckless disregard for the truth. The incorrect statement was not material to the probable cause in support of the search warrant.

A review of the testimony of the officers supports the trial court's finding and conclusion. Although Detective Pergande's statement concerning the name on the water account ultimately proved to be incorrect, the record reflects that this misstatement resulted from a misunderstanding or miscommunication between the officers, which amounts, at most, to mere negligence by Detective Pergande. It does not indicate that Pergande intentionally, knowingly, or with reckless disregard for the truth placed a false assertion in the affidavit. Innocent mistakes or even negligence are not sufficient to support a *Franks* claim. *See Franks*, 438 U.S. at 171; *Dancy*, 728 S.W.2d at 783. The trial judge heard testimony from all three detectives involved and concluded that the incorrect statement in the affidavit was an inadvertent mistake. As we previously noted, the trial judge at a suppression hearing is the sole trier of fact and exclusive judge of the credibility of the witnesses and the weight to be given to their testimony. *St. George*, 237 S.W.3d at 725; *Guzman*, 955 S.W.2d at 89.

Having reviewed the record and the applicable standards of review, we conclude that the record supports the trial court's finding and conclusion that Detective Pergande did not intentionally or knowingly make a false statement or one in reckless disregard for the truth in his search warrant affidavit. Accordingly, the trial court did not abuse its discretion by refusing to

suppress the evidence obtained during the search of appellant's apartment based on error contained in the affidavit.  We overrule appellant's third point of error.

## CONCLUSION

Finding no abuse of discretion in the trial court's denial of appellant's motions to suppress, we affirm the judgment of conviction.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed:   March 20, 2014

Do Not Publish